**FARNAN** LLP

**VIA E-FILING**                                          February 12, 2020

The Honorable Sherry R. Fallon
J. Caleb Boggs Federal Building          **FILED UNDER SEAL**
844 N. King Street
Room 3124, Unit 14
Wilmington, DE 19801-3555

**Re:   University of Massachusetts, et al. v. L'Oréal USA, Inc., 17-868-CFC-SRF**

Dear Judge Fallon:

We write in support of Plaintiffs' request for an order directing Defendant to satisfy promptly its production obligations pursuant to Paragraph 6 of the Court's Scheduling Order. D.I. 46, 64. That Order required Defendant to produce, on December 20, 2019, "Source code specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality." *Id.* ¶ 6(a).[1] To date, and despite numerous communications from Plaintiffs identifying deficiencies in this production and seeking supplementation, technical information is outstanding for the Accused Products in the chart attached as Exhibit A.

Courts interpreting patent production rules analogous to Paragraph 6(a) consistently hold that it "requires the alleged infringer to produce *any and all documents* describing the operation of any aspects or elements of an accused instrumentality." *Edward D. Ioli Trust v. Avigilon Corp.*, 2012 WL 5830711, at *3 (E.D. Tex. 2012) (emphasis added); *see also, e.g., NessCap Co. v. Maxwell Techs.*, 2008 WL 152147, at *3 (S.D. Cal. 2008) ("[T]his Court interprets the rule as requiring the alleged infringer to produce any and all documents describing the operation or structure of the patentee's accused devices."); *Cryptography Research, Inc. v. Visa Int'l Serv. Ass'n*, 2005 WL 1787421, at *2-3 (N.D. Cal. 2005) (ordering production of extensive variety of materials as falling within the "catchall 'other documentation' category"). This requirement is "not like other forms of discovery which require a formal request by the opposing party. Rather, it is the responsibility of the party itself to make disclosures that satisfy the Rules." *Edward D. Ioli*, 2012 WL 5830711, at *3 (quoting *Cryptography Research*, 2005 WL 1787421, at *3).

In its December 20 production, Defendant identified ingredient lists/officialization documents, product packaging, and marketing materials as satisfying the requirement to produce documentation sufficient to show the operation of the Accused Products. *See* Exs. C-G. Despite the fact that Defendant's public materials prominently advertise testing of the Accused Products, *see, e.g.*, Ex. F (product packaging citing results from consumer evaluation), Ex. H (product packaging citing results from "a clinical study of upper layers of the skin"), Defendant produced no product testing information. For some Accused Products, Defendant did not produce any information at all; for others, only partial information was produced. *See* Ex. A-2. After Plaintiffs

---

[1] The Order also required Defendant to produce "All agreements that the party opposing infringement contends are comparable to a license that would result from a hypothetical reasonable royalty negotiation" and "All agreements that may be used to support the damages case of the party that is denying infringement." *Id.* ¶ 6(c), (e). Defendant did not produce any agreements.

repeatedly notified Defendant of the production deficiencies, Defendant made supplemental productions, but information is still missing for the products identified in Exhibit A.

In the parties' meet and confers, Defendant first asserted that its production deficiencies should be excused because of the large number of Accused Products. *See* Ex. I, at 4-5. That is no excuse. Indeed, as the Court observed in the order denying Defendant's motion to dismiss, Plaintiffs' complaint put Defendant "on notice that products containing adenosine made by the eighteen brands specified in the FAC are accused of infringement." D.I. 31, at 9. Given that the Accused Products are a subset of Defendant's adenosine-containing products, and only those that meet the claim limitations of the asserted patents, Defendant has been on notice of the scope of this case, and its attendant discovery obligations, for years.

Second, Defendant claimed that it could not identify certain Accused Products. That is implausible and would not, in any event, justify Defendant's insufficient production. With their infringement contentions, Plaintiffs produced images of the Accused Products from Defendant's own product packaging or public websites. *See* Ex. B. Plaintiffs sent the Bates numbers of these previously-produced images to Defendant, but it continued to claim it could not identify certain products. *See* Ex. I, at 13. But to date, Defendant has named only three specific products it is unable to identify: Lancôme Absolue L'Extrait Day Cream, Lancôme Rénergie Night, and Lancôme Teint Visionnaire. *See id.*, at 6. As with every other Accused Product, these product names are taken *from Defendant's public materials*, and Plaintiffs have produced product images from Defendant's websites. *See* Ex. B. Defendant has more than enough information to identify these products and produce information about them.

We address each category of missing information in turn below.

1.  Ingredient lists

Formulation lists or officialization documents remain missing for 27 products. These documents are needed because they set forth the actual formulas for the Accused Products and other technical information relevant to the products' composition. They are therefore crucial to understanding how the Accused Products operate. Defendant has provided no explanation for the production deficiency, except to say that it has been difficult to identify the internal formula numbers for these products. *See* Ex. I, at 4. Defendant's delay of nearly two months in locating and producing these documents is inexcusable.

2.  Product packaging and marketing materials

Defendant identified various kinds of product packaging and marketing materials as part of its Paragraph 6(a) production. These documents are highly relevant to showing the "operation of any aspects or elements of" the Accused Products. For example, the documents make claims about the effects the Accused Products have on the skin:

- Packaging for L'Oréal Paris RevitaLift Double Lifting Eye Treatment claims that the product " ███████████████████████████████████████████████

  ████████████████████████████████████████████████

  ██████████ ." Ex. F.

*Restricted – Attorneys' Eyes Only*

- Packaging for Kiehl's Clearly Corrective Brightening and Smoothing Moisture Treatment says that the product is "███████████████████████████████████████████████ ████████████████████████████████████████." Ex. H.
- The marketing book for Kiehl's Double Strength Deep Wrinkle Filler provides extensive descriptions about how the product operates, including claims that the product is "████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████." Ex. J.

And the documents describe how the Accused Products are to be applied to the skin, including any limitations on their use. For example:

- Packaging for the RevitaLift Double Lifting Eye Treatment includes application instructions and a diagram. Ex. F.
- Packaging for Lancome Rénergie Lift Multi-Action Day Cream includes the warning not to apply the product to broken skin. Ex. L.

Product packaging and marketing materials plainly are documents showing the operation of the Accused Products and should have been produced on December 20. *See, e.g.*, *Cryptography Research*, 2005 WL 1787421, at *4 (ordering production of, among other things, "user manuals; tutorials; operating guides; [and] testing reports"). Defendant itself acknowledged the documents constitute part of its 6(a) obligation by identifying them as such in its December 20 production.

Nevertheless, packaging remains outstanding for 28 products and marketing materials for 68 products. *See* Ex. A. Defendant has argued that, so long as it eventually produces these materials in response to Plaintiffs' Requests for Production, it has satisfied its discovery obligations. *See* Ex. I, at 4-5.[2] This violates the purpose of Paragraph 6 of the Court's Order, which is to require production of key information for the Accused Products at the outset of discovery, with the burden on the Defendant to identify and produce the relevant materials. *See Nesscap*, 2008 WL 152147, at *3 (rejecting the defendant's position that would force patentees "to serve requests for production of documents, thereby prolonging the discovery period, increasing costs, and defeating one of the primary purposes of enacting patent local rules, which is to promote efficient discovery and reduce the potential for discovery disputes and wasted effort"); *Edward D. Ioli*, 2012 WL 5830711, at *3 ("Such rules exist to further the goal of full, timely discovery and provide all parties with adequate notice and information with which to litigate their cases. . . ."). In any event, the document production deadline was February 7, and these materials are still outstanding.

3. Testing information

Numerous materials Defendant has already produced refer to clinical and consumer testing of the Accused Products. For example:

- Packaging for the RevitaLift Double Lifting Eye Treatment claims that a consumer evaluation reported that "████████████████████████████████████████████████

---

[2] Defendant has also argued that the parties' agreement that Defendant could stage its production of marketing materials pursuant to Plaintiffs' Request for Production No. 31 lessened its obligations under Paragraph 6(a). Plaintiffs never agreed to extend the deadline for Defendant to make its Paragraph 6(a) production.

██████████████████████████.” Ex. F.
- Packaging for the Clearly Corrective Brightening and Smoothing Moisture Treatment touts results from "██████████████████████████.” Ex. H.
- The marketing book for the Double Strength Deep Wrinkle Filler includes a summary of test results from a "██████████████████████████.” Ex. J.

Yet Defendant did not include any testing information reflecting these "consumer evaluation" or "clinical stud[ies]" in its December 20 production. Such testing data shows how the Accused Products actually operate—and, indeed, Defendant relies on this data to make public claims about Accused Products' effect on skin. This internal testing information should have been produced pursuant to Paragraph 6(a). *See NessCap*, 2008 WL 152147, at *3 (analogous patent rule "offers the plaintiff a procedure for procuring additional [product] information, which the plaintiff could not obtain before initiating the litigation"); *Cryptography Research*, 2005 WL 1787421, at *4 (ordering the production of "testing reports," "software implementation analyses and/or evaluations," "test suites," and "test scripts," among other things).

In response to Plaintiffs' repeated requests to explain why Defendant did not produce this information on December 20, Defendant said only that Plaintiffs did not include testing information in its similar production pursuant to Paragraph 4(e). Any deficiencies in Plaintiffs' own production (which Plaintiffs certainly do not admit) would not reduce Defendant's own discovery obligations. Moreover, the parties are differently situated: Defendant relies specifically *on this very testing data* to make public claims about how the Accused Products operate, while Plaintiffs' own products instead rely on the Patents-in-Suit. *See, e.g.*, Ex. L. By putting the testing information in issue through its own public statements, Defendant has acknowledged its importance to understanding the Accused Products, and should have produced the testing accordingly. *See, e.g.*, *I-Flow Corp. v. Apex Med. Techs.*, 250 F.R.D. 508, 512 (S.D. Cal. 2008) (relying on the defendant's public statements about "years of research" to order additional documentation for the accused product). Defendant also should have produced any testing related specifically to the adenosine penetration of the Accused Products. *Cf.* D.I. 71, at 3-4 (Defendant's letter contending that Plaintiffs' adenosine testing data was immediately needed to "prepare its noninfringement and invalidity defenses . . . and develop related evidence during fact discovery").

4. <u>Financial Information</u>

The Scheduling Order also required Defendant to produce "Documents sufficient to show the sales, revenue, cost, and profits for Accused Instrumentalities . . . for any period of alleged infringement" on December 20. D.I. 46 ¶ 6(d). Defendant's initial production of financial data was incomplete—information was missing entirely for nearly a third of the Accused Products, and for several product divisions for 2011-2012. After two meet-and-confers and many written communications where Plaintiffs sought the missing information, Defendant produced nearly all the outstanding information on February 7, 2020. Financial data for certain years is still missing for six products, and Plaintiffs expect Defendant to provide that data by the end of this week.

For the foregoing reasons, Plaintiffs respectfully request that the Court order production of the outstanding materials, including product packaging, marketing materials, and product testing.

*Restricted – Attorneys' Eyes Only*

Respectfully submitted,

/s/ Brian E. Farnan

cc: Counsel of Record (Via E-Mail)          Brian E. Farnan